**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF WEST VIRGINIA**
**AT CHARLESTON**

**UNITED STATES OF AMERICA**

**V.**                                        **CRIMINAL ACTION NO: 2:10-00024**

**AUGUSTO ABAD, M.D.**
                    **DEFENDANT.**

**SENTENCING MEMORANDUM**

Comes now the Defendant Augusto Abad, M.D., by counsel Jane Moran and Thomas Ward, to present his Sentencing Memorandum.

**STATEMENT OF FACTS**

The Justice Medical Complex, a private for profit healthcare clinic, was formed in May 2005 by Debra C. Justice and Gregory Wells.  The original plan of the incorporators was that Gregory Wells would serve as the primary physician for the Clinic, assisted by medical residents from the Marshall University School of Medicine. It was later revealed that Wells had prior Federal convictions for illegal dispensing of controlled prescription medication and defrauding the Kentucky Medicaid Program.  When Wells was denied a license to practice medicine in West Virginia, he became the Manager of the Clinic and recruited Dr. John T. Tiano and Dr. Feras Ahmad El-Bash as primary physicians.

Wells had become acquainted with Pharmacist James P. Wooley while Wells was in a half-way house during the later part of his Federal sentence.   Wooley had owned several pharmacies in Kentucky and West Virginia, which he lost as a result of financial difficulties.  He retained ownership of Save-Rite Pharmacy in Kermit, West Virginia and opened a second Save-Rite Pharmacy in September 2008 in a building which adjoined

1

the Justice Medical Complex.  The building was owned by the family of Debra Justice.  Virtually all of the thousands of prescriptions generated by the Clinic over the years of its operation were filled in one of Wooley's pharmacies.

The incorporators eventually removed founder Gregory Wells as a member of the corporation.  Cameron Justice became the President and Owner of the Justice Medical Complex when he allegedly purchased it from his mother Debra Justice. After the departure of Gregory Wells, Cameron Justice managed the daily operations of the Clinic.  Justice had neither prior medical experience nor prior management experience.

Dr. Tiano served as Supervisor of the Clinic staff of Nurse Practitioners and Physician's Assistants from September 2005 until December 2007.  He concurrently maintained his residency with the Marshall University School of Medicine until he was advised by the Medical School that his work with the Clinic violated the terms of their residency program.  He was reprimanded by the West Virginia Board of Medicine for his practices while employed by the Justice Medical Complex.  Dr. Tiano resigned from his position with the Clinic in December 2007, but continued to receive financial benefits from it until December 2008.  Dr. Tiano estimates his total income from the clinic in excess of $100,000.00.

During the period in which Dr. Tiano supervised the Clinic staff, he and Manager Cameron Justice established operative procedures, which included allowing Nurse Practitioners and Physicians' Assistants to write prescriptions for Hydrocodone and Alprazolam using Dr. Tiano's name and DEA registration number.  This practice allowed the second line medical staff to write prescriptions for 30 day supplies of controlled substances instead of their more restricted authority under State law to write 72 hour

2

prescriptions in their own names, using their own DEA numbers.  In large part as a result of this practice, the rural clinic became a haven for persons seeking narcotic drugs in amounts that exceeded what they could  have obtained elsewhere.

In December 2007, Augusto Abad, M.D. was recruited by Manager Cameron Justice to fill the position Dr. Tiano had left.  Dr. Abad was unaware of the prior legal difficulties of the Clinic personnel or of the reason for Dr. Tiano's departure.  He was told by Cameron Justice that Dr. Tiano left to devote more time to his studies. Justice impressed on Dr Abad the community need for the remote, rural clinic and persuaded him that he would be providing a great community service if he was to take on the supervisory role previously held by Dr. Tiano.

Because he was aware of the clinic's reputation as a pain clinic which might be utilized by persons who were seeking excessive pain medication, Dr. Abad was reluctant to accept the position. He told Cameron Justice that he was an internist, not a pain specialist.  Dr. Abad agreed to help when Cameron Justice convinced him that the communities of Crum, West Virginia and Kermit, West Virginia needed his services.  At the time he agreed to help Cameron Justice, Dr. Abad advised him that new policies and standards would have to be set up to control the number of patients seen at the clinic and the amount of Schedule III drugs administered to the individual patient.

Dr. Abad began his association with the Clinic in January 2008 on the basis of his oral agreement with Cameron Justice.  Dr. Abad never entered into a written agreement with Cameron Justice, the Justice Medical Complex or James R. Wooley.   His relationship with the Justice Clinic continued until March 26, 2009.  Dr. Abad initially refused to accept any salary for his services.  He eventually accepted, in lieu of any

3

salary, health insurance coverage for himself and his family, use of a leased 2008 Mercedes Benz and two $5,000 bonuses, one unsolicited, the other solicited.  He accepted no other compensation for his 15 months of service.  The Government has placed a value of $40,000 on the compensation he received.

At all relevant times, Dr. Abad possessed a DEA registration number at a location of 2306 Hospital Drive, Suite 202C, South Williamson, Kentucky, his Kentucky private office.  All of the controlled substance prescriptions at issue herein, were dispensed through the Clinic in West Virginia under his Kentucky DEA number.  Dr. Abad obtained a West Virginia DEA number for the clinic location on or about October 31, 2008 however, no controlled substance prescriptions have been identified using his West Virginia DEA number.  Clinic patients were routinely seen by the Nurse Practitioners and Physicians' Assistant who wrote prescriptions for controlled substances, including Hydrocodone and Alprazolam, under Dr. Abad's name and DEA number, in quantities intended to cover a 30-day supply.

Dr. Abad's principal practice was conducted from his office in South Williamson, Kentucky.  He continued to conduct this full time solo practice throughout the time he was associated with Justice Medical Complex and continues to do so today. Initially, the doctor would spend one to two days a week on the grounds of the Clinic supervising Nurse Practitioners and Physicians' Assistants and reviewing case files.  As the caseload increased in his solo private practice however, the time he had available to visit the clinic decreased.  He eventually reduced his onsite Clinic time to one afternoon a week, and spent many additional  hours a week reviewing files on his home computer.

Patients generally made monthly visits to the Justice Clinic.  During his early months supervising, Dr. Abad was able to decrease the census of the number of patients and the amount of controlled substances prescribed.  However, as the census in his private practice increased and he spent less time at the Clinic, the number of clients seen in the Clinic increased, as did the amount of Schedule III drugs prescribed.

The Nurse Practitioners who were employed at Justice Medical Complex provided on-site services to the clinic patients.  Dr. Abad's role was to review and co-sign the clinic computerized patient charts from his home in Charleston, West Virginia, after the patients were seen by the Nurse Practitioners. He relied on photos to become familiar with patients as well as medical histories provided by the Nurse Practitioners.  If a Nurse Practitioner had a question, Dr. Abad was available by cell phone or pager.

Dr. Abad had collaborative agreements with most of the Nurse Practitioners relative to his association with the Clinic.  The agreements were approved by the West Virginia Board of Nursing and placed on file with them.  He also had an agreement with a Physician's Assistant relative to the Clinic, which was on file with the West Virginia Board of Medicine.  The doctor had not previously utilized the services of either Nurse Practitioners or Physicians' Assistants in his private solo practice.  He instructed the Nurse Practitioners to never prescribe narcotics during a patient's first visit, unless it was a clear cut case with a documented history, and told them to obtain MRI's, X-rays and physician reports prior to prescribing narcotics

Mid-level providers at the Justice Medical Complex (Nurse Practitioners), who had both prescriptive authority and a DEA registration number in their own names,  did not prescribe controlled substances using their individually assigned DEA number as

required.  These mid-level providers used the DEA number of Dr. Abad, which was not limited by the conditions that a mid-level provider must follow when prescribing under State law.  Specifically, they were not limited to ordering a seventy-two (72) hour supply, without refills, for all Schedule III controlled substances, when they used Dr. Abad's number.

On or about November 12, 2008, "S.B." was found dead.  Only 14 of the Hydrocodone and 7 of the Alprazolam prescribed by mid-level providers at the Clinic were found.  Also found were several straws containing a white powder residue.  The West Virginia Medical Examiner has determined that "S.B." died of a heart attack and did not report that  drugs provided under Dr., Abad's name caused her death.

One of the Nurse Practitioners supervised by Dr. Abad, had seen "S.B" and caused her prescriptions to be issued under Dr. Abad's name and DEA number.    The Doctor and this Nurse Practitioner clashed regarding her authority to prescribe after the death of "S.B.".  They entered into an amended written collaborative agreement, which was never approved by the West Virginia Board of Nursing, although collaborative agreements are typically submitted to the West Virginia Board of Nursing for approval. Pursuant to the new collaborative agreement, the Nurse Practitioner was not allowed to initiate dosages, but was allowed to continue to use Dr. Abad's name and DEA number to issue controlled substance prescriptions for continuing treatment.

Dr. Abad allowed the Justice Clinic to use his Medicare and Medicaid provider numbers for billing purposes.  He failed to monitor the frequency and the justification given for the charges reported by the Clinic under his name. During Dr. Abad's tenure at the Clinic, the patient charts submitted for billing purposes generally indicated that he

6

was a "provider" of medical services, although patients were not actually seen by him. The Nurse Practitioners were the actual providers of patient care. The charts usually indicated that Nurse Practitioners were also providers. The Clinic received payment at a rate for physician providers in either case.

Because of the increasing number of Clinic patients, Dr. Abad was unable to keep up with his review of the patient charts while maintaining his very active solo practice in Kentucky. He did not thoroughly review all of Justice Clinic's patient charts, and sometimes, co-signed the charges without reviewing them. On at least three occasions, Dr. Abad asked the company that performed billing services for the clinic to co-sign a bulk number of progress notes in patient charts which he had not reviewed. The large volume of  chart notes pending review had caused the Justice Medical Complex to be locked out of the computerized billing system. They would not be readmitted to the system until the back log had been decreased.

Throughout Dr. Abad's tenure at the Clinic, he received electronic notifications of prescriptions for controlled substances written on his behalf by the mid-level providers, which he failed to adequately monitor. The clinic transmitted virtually all of its controlled substance prescriptions to the Save-Rite Pharmacy in Kermit, Mingo County, West Virginia, and later to the new branch of that pharmacy located immediately adjacent to the Clinic building.  Dr. Abad was never personally contacted by a pharmacist regarding the prescriptions issued through the Clinic under his name and DEA number to verify his relationship with the Justice Clinic.  The doctor was never contacted with a question regarding any specific prescription.  He was never contacted to question the extraordinary volume of prescriptions generated by the Nurse Practitioners.  Nor was he notified when

the pharmacies received prescriptions written for "patients" Cameron Justice, Debra Justice and the Nurse Practitioners for Schedule III drugs without Dr. Abad's knowledge.

Dr. Abad had knowledge that a significant percentage of the clinic patients were on Medicare or Medicaid and that they normally paid for their care and prescription medications using Medicare or Medicaid. Dr. Abad had an affirmative obligation to maintain close vigilance over the reports of persons billing for services under his Medicare/Medicaid numbers. He understands that his negligence in failing to do so allowed the Justice Medical Clinic to fraudulently bill for services far in excess of the hourly rate to which they were entitled.

Similarly, Dr. Abad accepts responsibility for his negligent failure to maintain adequate oversight over the use of his DEA Number by med-level medical staff and the resulting repeated illegal prescribing of controlled substances by staff not authorized or competent to determine an appropriate dosage of the drugs. To the degree he was aware they were prescribing in excess of their 72-hour authorization under State law, the doctor participated in the Clinic's fraud of the Government programs. To the degree the Government reports his number being used without the doctor's knowledge, he bears the responsibility for his reckless and grossly negligent failure to maintain supervision over use and misuse of the number.

Dr. Abad respectfully reminds the Court of the pressure placed on practicing physicians in the Southern coal fields by the shortage of skilled practitioners. Communities are underserved by the doctors who continue to practice. There is a fine line between a doctor's efforts resulting in a patient being underserved and the patient being badly served. Dr. Abad failed to meet the needs of his patient, but his intent was to

provide what service he was able to provide.    It was never his intent to profit from the limited service he provided.  As reported by the Probation Officer in Dr. Abad's PSR, (Paragraph 35) "Dr. Abad asserts he had no knowledge of this practice [billing for services not actually provided by the doctor] and the Government has no information to suggest he was a part of this aspect of the healthcare fraud."  His violations were the result of his neglect of administrative procedure, rather than a plan to defraud.

Dr. Abad has continued to maintain his solo private practice in Kentucky at all times since the Government charges were filed against him. He has lost approval to charge for Medicare and Medicaid Services and, with that, the ability of most of his patients to pay for the services he provides.  As a result, he now finds it necessary to provide charity care for the patients he feels he cannot desert.  He has lost admitting privileges at Williamson Memorial Hospital in Williamson, West Virginia and the Appalachian Regional Hospital in South Williamson, Kentucky because of his inability to charge Medicare or Medicaid for his services or his patients' medications, and because of his pending felony charges.

The doctor has lost his DEA numbers in Kentucky and in West Virginia. Currently when he feels it is necessary to prescribe a Schedule III drug, he sends the patients to the Pain Management Clinic in Pikeville, Kentucky.  He continues to prescribe non-controlled medications.

The West Virginia Board of Medicine has taken no action against Dr. Abad and, to the best of his knowledge, the Board is conducting no current investigation of his charges.  He is aware of no directives having been issued by the West Virginia Board of Medicine warning against the common practice of Nurse Practitioners writing

prescriptions. The doctor's charges are currently being investigated by the Kentucky Board of Medicine, but no action has been taken against his license.

Dr. Abad recognizes that his failure to maintain the level of professional responsibility in billing Medicare/Medicaid for his services which he contracted with the Government to provide, and his practice of allowing the unsupervised use of his DEA Number caused and contributed to wide spread violations of 21 U.S.C. §846.  He sees that his negligence, though not motivated or influenced by personal gain, has resulted in repeated violations of Federal law by him and his associates.  Moreover, it has caused or contributed to the increased dependence of many of his Clinic patients on prescription drugs which they cannot legally obtain.

Dr. Abad has entered into a consent decree with the Office of the U. S. Attorney Civil Division for damages totaling $225,000.  These damages arise from the doctor allowing improper use of his DEA Number which led to false claims for service to Medicare/Medicaid by him and by the Justice Medical Complex.  In his plea agreement Dr. Abad acknowledged he owes Medicare/Medicaid restitution totaling $110,959.45 for services billed by the Justice Medical Clinic in his name, which were not provided.  He has been advised by counsel for the Criminal and Civil Offices of the U. S. Attorney's Office that any restitution Ordered by the Court will be applied to payment of his civil liability.  Dr. Abad is presently in the process of liquidating his dwindling assets to make payments on the civil judgment against him and on any restitution Ordered by the Court.

From the day that Federal Agents appeared at his door with a search warrant in hand, Dr. Abad has fully cooperated with Government agents and Prosecutors.  He has been forthcoming, never denying during intensive debriefing by Government attorneys,

his role in the conspiracy charged.   He has appeared before a Grand Jury, at the Government's request.   He has entered into a consent decree with the Office of the United States Attorney Civil Division to pay civil damages.  If he is able to sell the real property he owns, he will turn the proceeds over to the Government to apply either to the civil judgment or to any restitution Ordered by the Court.

## OBJECTIONS

### PARAGRAPH 46

The Probation Officer has recommended a two level enhancement for Dr. Abad's role in the conspiracy on Count One of the Information because of his position as a supervisor of others involved in the conspiracy.   Dr. Abad stands ready to accept responsibility for what he knew or should have known in light of his position.  He argues, however,  he was not aware of the fraudulent billing process being used by Cameron Justice to defraud the Government through the use of  his Medicare/Medicaid provider number.  Dr. Abad should have known;  he should have monitored the Clinic's  practices; but he did not. Through his lack of vigilance, and eventually his conscious practice of approving case records of patients he had never seen and whose course of treatment he had not approved, Dr. Abad violated Federal law.    As a result he has plead guilty of offenses against the United States Government.  The reality was, despite his supervisory role, Dr. Abad may have been the least informed of any of the members of the conspiracy regarding administrative billing procedure and the scope of the illegal activity in which he was involved.   The number of prescriptions bearing his DEA Number, the billing

practices of the Justice Medical Complex and the number of patients they reported him to have personally examined are figures the doctor should have know, but he did not.

The Government contends, and Dr. Abad agrees, that his negligence in failing to maintain his oversight duties to control the activities of the conspiracy is a sufficient basis to support his criminal liability for the acts of his co-conspirators. They cannot consistently argue that he was sufficiently aware of the day to day activities of the group to qualify him as an organizer, leader, manager or supervisor of the group's criminal efforts to defraud the Government. Cameron Justice and the members of the Clinic staff the doctor supervised had a much better understanding of the scope of the conspiracy than did Dr. Abad. The man who recruited him, Cameron Justice, and Dr. Abad's predecessor, Dr. Tiano, had a much higher degree of input in the planning and organization of the Clinic's procedures; exercised much more decision making authority and control of the criminal activity; and claimed a right to a much larger share of the fruits of the conspiracy than Dr. Abad. These are all factors to be considered in determining if a two-point enhancement under USSG §3B1.1 is appropriate.[1] On these grounds, Dr. Abad objects to the Probation Officer's recommendation that he receive a two-point enhancement for his supervisory role in the offense.

---

[1] "This section [USSG §3B1.1] provides a range of adjustments to increase the Offense Level based upon …the degree to which the Defendant was responsible for committing the offense. This adjustment is included primarily because of concerns of relative responsibility. However, it is also likely that persons who exercise a supervisory or managerial role in the commission of an offense tend to profit more from it and present a greater danger to the public and/or are more likely to recidivate. The Commission's intent is that this adjustment should increase with both the size of the organization and the degree of the Defendant's responsibility." USSG §3B1.1 Background.

**PARAGRAPHS 47 & 56**

The Probation Officer recommends a two-point enhancement of Dr. Abad's sentence on Count One in that he "…also occupied a position of public and private trust by virtue of his occupation as a physician.  The Defendant's position contributed to the concealment and lack of initial detection because he was issued a DEA Registration Number and his affiliation, by name, provided credibility to the Clinic."

Guideline 3B1.3 provides "…if this adjustment is based solely on the use of a special skill; it may not be employed in addition to an adjustment under §3B1.1." (Emphasis added)   The Guideline Commentary defines a "special skill" as one "…not possessed by members of the general public and usually requiring substantial education, training or licensing.  Examples would include pilots, lawyers, doctors, accountants, chemists and demolition experts."  (USSG §3B1.3 Commentary Application Note 4) Additional aid in applying §3B1.3 is provided in the "Background" statement to the Guideline. "Background.  This adjustment applies to persons who abuse their position of trust or their special skills to facilitate significantly the commission or concealment of a crime."  USSG §3B1.3 Commentary Background

It appears the Sentencing Commission did not contemplate adjustments of the Defendant's sentence for both his role as a supervisor and for an alleged abuse of a position of trust when the abuse of trust would be based on his special skill as a doctor. To find that Dr. Abad's sentence should be enhanced because of his role as a supervisor requires the Court to make factual findings that would prevent a second enhancement for an alleged abuse of his position of trust.  On  these grounds the Defendant objects to an enhancement to his sentence for an abuse of his position of trust if the Court also Orders

enhancement  of his sentence for his supervisory role in the conspiracy, as recommended in Paragraph 46 of the PSR.

The factual basis used by the Probation Officer to support her recommendation in Paragraph 56, to impose a second two-level enhancement for Dr. Abad's abuse of a position of trust on Count Two, also conflicts with the exception provided in USSG §3B1.3.  "If this adjustment is based solely on the use of a special skill, it may not be employed in addition to …§3B1.1,"  The Officer reports that Dr. Abad violated his Hippocratic Oath, his duty to review all patient files, and to be diligent in his care of the Clinic patients.  The Officer concluded that Dr. Abad's "…position contributed to the concealment of the offense because his affiliation as the Clinic's physician gave credibility to its operation. (PSR Para. 56) The Officer's recommendation for a second two-level enhancement cannot be applied in concert with a two-level enhancement under USSG §3B1.1.

**PARAGRAPH 55**

The  Probation  Officer  recommends  a  two-level  enhancement[2]  of  Dr.  Abad's sentence for Count Two of the Information for his "…lack of affirmative action" to terminate the use of his DEA number after learning his collaborative agreements with the Nurse Practitioners were being disregarded.

This accusation ignores the unrefuted report by Dr. Abad that he did attempt to limit the use of his DEA number by the one Nurse Practitioner he recognized as abusing the collaborative agreement which permitted her usage of his number.  Following the

---

[2]   The Probation Officer cites USSG §3B1.1(b) as authority for her recommendation and recommends a two-level enhancement.  Defendant suggests this was a typographical error and the Officer intended to cite USSG §3B1.1(c), which application would result in the two-level enhancement she recommended.

death of  "S.B." he required the Nurse Practitioner to enter into a new, modified collaborative agreement with him, which limited her ability to prescribe under his number.

The terms of Dr. Abad's collaborative agreements with the Nurse Practitioners were approved by the West Virginia Board of Nursing, but because of his negligent disregard of the terms of his agreement with the Government agencies and the doctor's reckless disregard of the manner and usage of his collaboration, he violated the terms of his agreement with the Government agencies and violated Federal law.  However, the criminal conduct by the Defendant cited in Paragraph 55 of the PSR, "…lack of affirmative action" which "…permitted the criminal conduct to continue and grow" (PSR Paragraph 55), reflects a deliberate effort to protect the fraud,  which is not reflected in the Government's evidence.  Dr. Abad did not know that he was violating Federal law when he allowed the mid-level medical staff to use his DEA number, or when he failed to monitor the Clinic billing process.  Had he complied with the terms of his Government contracts to insure the quality of care provided the records would have revealed to him that he was cooperating in a fraudulent plan to obtain funds from the Government. The willfulness of Dr. Abad's action is found in his knowing and willful failure to maintain the professional standards of his duty to his patients through direct contact and through careful oversight of the second line of medical providers he supervised. On these grounds Dr. Abad objects to the two-point enhancement to his sentence on Count Two of the Information as recommended by the Probation Officer in Paragraph 55 of the PSR.

## TOTAL OFFENSE LEVEL

If the Court disregards the recommendations for the enhancements recommended in Paragraphs 46, 47, 55 and 56 of the PSR, the Total Offense Level applied to the doctor's case would be:

### COUNT ONE

|  |  | Units |
|---|---|---|
| Base Offense Level (USSG §2B1.1) | 6 | ½ |
| Adjusted Offense Level | 6 | ½ |

### COUNT TWO

| | | |
|---|---|---|
| Base Offense Level (USSG §2B1.1) | 6 | |
| Specific Offense Characteristic | 8 | |
| Adjusted Offense Level | 14 | 1 |
| | | |
| TOTAL NUMBER OF UNITS | | 1 ½ |
| Increase in Offense Level | 1 | |
| | | |
| COMBINED ADJUSTED LEVEL | 15 | |
| ADJUSTMENT FOR ACCEPTANCE OF RESPONSIBILITY | 2 | |
| **TOTAL OFFENSE LEVEL** | **13** | |

Dr. Abad has no prior criminal record and a Criminal History Category of I with a Total Offense Level of 13.  The Sentencing Table of the USSG would indicate a sentence

18 to 24 months.   Since this would fall into Zone D of the table, the Guidelines recommend that the sentence be served by incarceration.

The Probation Officer cites the case of Gall v. United States, 522 U. S. _____ Slip Opinion Pg. 20 (2007) as authority for the high degree of discretion now afforded the Sentencing Court.

> If the Guidelines were still mandatory, and assuming the facts did not justify a Guideline based downward departure, this would provide a sufficient basis for setting aside Gall's sentence because the Guidelines state that probation alone is not an appropriate sentence for comparable offenses. [Ft.note omitted] But the Guidelines are not mandatory and thus the 'range of choice dictated by the facts of the case' is significantly broadened, moreover, the Guidelines are only one of the factors to consider when imposing sentence, and §3553(a) directs the Judge to consider sentences other than imprisonment. Gall v. United States, Ibid. at Pg. 20

Dr. Abad argues the increased discretion in sentencing afforded the Court under 18 U.S.C. §3553  directs the Court to impose a sentence which  "…is sufficient, but not greater than necessary" to "…reflect the seriousness of the offense, promote respect for the law and to provide just punishment for the offense"; deters criminal conduct; and protects the public from further crimes by the Defendant." 18 U.S.C. §3553 (a)(2). Within those guidelines, the Court may consider any fact based consideration that is not contemplated by the Guidelines. (See USSG §5K2.0(a)(2)(B)) (Also see: United States v. Booker, 543 U.S. 220 (2005))

There are several factual issues which Dr. Abad argues would isolate his case from the heartland case contemplated by the Sentencing Commission.  The first of these

is the fact that he has no criminal record, nor any previous record of bad behavior.  The Guidelines provide no way for the Court to recognize this, except to classify his Criminal History as Category I and group him with past offenders.  Recognition of Dr. Abad's clean criminal history correlates with the likelihood he would never reoffend after experiencing the public humiliation and financial devastation which has been the result of his plea of guilty to the charges against him.

Dr. Abad has forfeited his reputation and public image as a well liked, highly competent physician through newspaper and television coverage of the conspiracy in which he was involved.  He can no longer prescribe Schedule III drugs nor admit patients to local hospitals.  His loss of privileges to bill Medicare/Medicaid has been financially debilitating to his practice and to him personally.  Although he has not yet lost his medical licenses to practice in West Virginia or in Kentucky, it is inevitable that this deprivation will occur.  Dr. Abad has been financially devastated by his participation in the conspiracy of the Justice Medical Complex and, for all practical purposes, has lost his ability to support his wife and two children with the skills he has relied upon for all of his adult life and which he used to bring his family to this country.

There is every reason to believe that Augusto Abad, M.D. will be deported from the United States at such time as the judgment against him is final.  The Antiterrorism and Effective Death Penalty Act of 1966 (hereinafter AEDPA) and The Illegal Immigration Reform and Immigrant Responsibility Act of 1966 (hereinafter IIRIRA) have been interpreted to curtail the prior authority of the Attorney General to waive deportation of resident aliens.   Tho IIRIRA substituted a new section [8 U.S.C. §1227(2)(A)(iii)] for the existing waiver provisions. It excluded from those otherwise

eligible for a waiver anyone convicted of an aggravated felony.  A conviction is defined as a judgment of guilt with some form of punishment imposed by the Court. (8 U.S.C. §1101 (a)(48)) An "aggravated felony" would include a conviction that "involves fraud or deceit in which the loss of the victim or victims exceeds $10,000." (8 U.S.C. §1101(a)(43))

Dr. Abad having entered his plea to a crime of fraud which the Probation Officer reports resulted in a loss of more than $70,000 to the victim Medicare/Medicaid.  It appears he is deportable under the Federal Statute.  Moreover, since the Defendant's offense involved the transfer of a controlled substance, it is likely the immigration authorities would also charge Dr. Abad with an Aggravated Drug Felony which would be grounds for deportation and inadmissibility for the Defendant's eventual return.

Despite the extremely harsh effects of the IIRIRA amendments to the Naturalization/Immigration Statutes however, there remains in the law a very narrow window of opportunity for a convicted felon to avoid deportation. The amended Immigration Statute still provides an alien convicted of a deportable crime with an opportunity to seek a waiver of deportation.  (8 U.S.C.§1182(h)).  Although conviction of an aggravated felony would appear to preclude this possibility, there may still be a narrow opening which could allow Augusto Abad, M.D. to remain in the United States. The remaining waiver provision now identified as "Cancellation of Removal," provides for a possibility that a convicted felon might avoid being deported if (a) the Defendant is a permanent resident, who (b) has resided in the United States for a minimum of seven years and been a permanent resident for at least five years, before his removal proceedings. He might also be subject to Cancellation of Removal, if the sentence

imposed is not "final" or if extreme hardship would be imposed on others, usually family members, by the Defendant's deportation. (8 U.S.C. §1229 (b))

More than 150 letters of community support and[3] statements of individual and community need for Dr. Abad's continuing service to the region have been submitted to the Court.  The lack of adequate medical care in this remote Southern West Virginia is no longer in question.  It is an accepted fact.  Dr. Abad is one of the few competent, well liked physicians who have come to the area, established a practice and remained in the County despite opportunities to make more money in urban areas.[4]  The letters speak for him.  Augusto Abad is a valuable asset to his community, despite the revelations of his participation in the conspiracy surrounding the Justice Medical Complex.  He anticipates submitting these statements to the Immigration Judges at the time he appears before them.

Dr. Abad respectfully asks for a variance by the Court from the Guidelines based on the statements of need submitted by Mingo/Pike County citizens and that the Court either  suspend final judgment of his conviction or place Dr. Abad on probation while he attempts to persuade the Immigration and Naturalization Service that his usefulness to his American home far outweighs the likelihood that he would ever re-offend.   The seriousness of his crime has already been impressed on him, his family and the community at large by his public humiliation and financial ruin.  His incarceration and eventual deportation would add little to this already devastating impact.

---

[3] An additional _____ letters of support of the doctor were submitted to the Office of the U.S. Attorney following Dr. Abad's arraignment.

[4] Dr. Abad is the only endocrinologist in the region who is prepared to apply for certification in this speciality.

In the alternative, if the Court does not find it feasible to impose the alternative sentencing suggested above, the Defendant respectfully prays that the Court depart downward from the recommended sentence and recognizing the inevitability of his deportation; Order that Defendant be placed on probation in a Community Correctional Facility under the terms and conditions of probation as set forth in 18 U.S.C. §3563; that the Court give Notice to the Immigration and Naturalization Service that the judgment against Defendant Augusto Abad, M.D. has been finalized; and that the Court Order that he be deported forthwith.

Augusto Abad, M.D. has committed a crime for which he had no evil mensrea. He participated in a successful conspiracy to defraud the Medicare/Medicaid programs through inaccurate, fraudulent billing processes.  Dr. Abad became a co-conspirator when he allowed the conspirators to utilize his identity as a doctor, his good name, his DEA Number and his Medicare/Medicaid billing privileges and he failed to monitor the manner in which these privileges were being used.  He knew or should have known that irregularities in the billing process were occurring.  His failure to take control of his DEA Number and Medicare/Medicaid Numbers and withdraw from the illegal practices the moment he suspected wrongful activity, has resulted in his guilty plea to the Information now before the Court.  His initial involvement was the result of his unrefuted desire to help the sick and the poor of Southern West Virginia.  He accepts total responsibility for his failure to comply with Federal law in performing these acts of care.  Defendant Augusto Abad, M.D.   respectfully asks that the Court consider these factors in determining his appropriate sentence.

**RESPECTFULLY SUBMITTED**
**BY COUNSEL**

Jane Moran, Esq.
WV State Bar No. 2615
JANE MORAN LAW OFFICE
P. O. Box 221
Williamson, WV  25661

Thomas Ward, Esq.
WV State Bar No. 3921
WARD & ASSOCIATES
P. O. Box 628
Williamson, WV  25661

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON**


**UNITED STATES OF AMERICA**

**v.**                                             **Criminal No. 2:10-00024**

**AUGUSTO ABAD, M.D.,**
           **Defendant.**


**<u>CERTIFICATE OF SERVICE</u>**

The   undersigned   hereby   certifies   that   the   foregoing   **SENTENCING
MEMORANDUM** has been electronically filed with  the Clerk of the Court this date
using the CM/ECF system and served upon opposing counsel as follows:


**VIA CM/ECF:**                          Monica Schwartz
                                         Asst. U. S. Attorney
                                         P. O. Box 1713
                                         Charleston, WV 25326


Dated:   July 8, 2010                    <u>s/Jane Moran, Esq.</u>
                                         Jane Moran, Esq.
                                         WV State Bar No. 2615
                                         Jane Moran Law Office
                                         P.O. Box 221
                                         Williamson, WV 25661
                                         Telephone: (304) 235-3509
                                         Fax:  (304) 235-3509
                                         E-mail: janemoran3@hotmail.com